Filed 10/28/24  Hollendorfer v. California Horse Racing Board CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JERRY HOLLENDORFER,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA HORSE RACING BOARD,<br><br>Defendant and Respondent. | D082647<br><br><br>(Super. Ct. No. 37-2020-00016369-CU-WM-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, Ronald F. Frazier, Judge.  Affirmed.

couto&associates, Drew J. Couto; Law Office of Leif Kleven and Leif H. Kleven for Plaintiff and Appellant.

Rob Bonta, Attorney General, Chris A. Knudsen, Assistant Attorney General, and Gary S. Balekjian, Deputy Attorney General, for Defendant and Respondent.

## I.   INTRODUCTION

Horse trainer Jerry Hollendorfer appeals from a judgment denying his petition for a writ of mandate and damages against the California Horse Racing Board (CHRB), which oversees California horse racing under the state's Horse Racing Law (Bus. & Prof. Code, § 19400 et seq.).[1]

Two racing association entities denied him participation in race meets under their race meet agreements (RMAs) with the trainer organization, California Thoroughbred Trainers (CTT), after he experienced six equine deaths.  He sought relief in multiple ways:  complaints to the CHRB, with hearing requests under Section 19573; grievances to CTT, which filed administrative complaints with the CHRB; and lawsuits (in part with CTT, and all settled).  The CHRB investigated Hollendorfer's complaints and determined no hearing was due.  CTT withdrew one administrative complaint, and the CHRB dismissed the other on mootness grounds.

Hollendorfer then filed this action, alleging the CHRB erred in various ways, including by denying his hearing request and in its handling of CTT's administrative complaints.  He also alleged the CHRB's failure to carry out its mandatory duties violated Government Code section 815.6.  The trial court rejected each claim, concluding he established no duty to provide a hearing and lacked standing to challenge the CTT proceedings.  The court also denied his request to present live testimony.

Hollendorfer challenges these determinations and maintains more generally that the CHRB deprived him of due process.  We conclude he establishes no reversible error, and affirm the judgment for the CHRB.

---

[1]   Further statutory references are to the Business and Professions Code, and rule references are to title 4 of the California Code of Regulations, unless noted.

2

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Horse Racing in California*

For context, we begin by describing the laws and regulations governing horse racing in California.  Pursuant to article IV, section 19, subdivision (b) of the California Constitution, the Legislature has " 'enacted a comprehensive scheme of legislation designed to regulate almost every aspect of legalized horse racing and wagering.' " (*Youst v. Longo* (1987) 43 Cal.3d 64, 81, italics omitted.)  This statute is known as the Horse Racing Law.  (§ 19400.)

The Horse Racing Law vests the CHRB with "[j]urisdiction and supervision" over horse racing in the state.  (§ 19420.)  Its responsibilities include "[a]dministration and enforcement of all laws, rules, and regulations affecting horse racing," and it can delegate to racing officials known as stewards.  (§ 19440, subds. (a)(3), (b).)  The CHRB is authorized to "prescribe rules, regulations, and conditions . . . under which all horse races with wagering" are conducted.  (§ 19562.)  Pursuant to this broad regulatory power, the CHRB has promulgated extensive rules.  (See Rule 1400 et seq.)

Both the Horse Racing Law and the CHRB rules contain provisions regarding exclusions from race meet "inclosures" (i.e., areas licensed to operate meets).  (§ 19410.)  Under Section 19572, the CHRB can and has issued rules "provid[ing] for the exclusion or ejection" of certain persons, such as a "known bookmaker . . . ." (§ 19572; e.g., Rules 1980 [identifying "classes of persons"], 1981 [racing associations "shall exclude and eject from their inclosures" such persons], 1983 [excluded or ejected person may apply for hearing on "question of whether he is within . . . [prohibited] classes"].)  It also enacted Rule 1989, which provides in part that "[a]ny person may be removed or denied access for any reason deemed appropriate" by the racing association.  (Rule 1989(b).)

3

Section 19573 states, in pertinent part, that "[a]ny person who, pursuant to a rule of the board, is excluded . . . may apply to the board for a hearing on the question of whether the rule is applicable to him. [¶] The board shall hold the hearing either at its next regular meeting . . . or at such other place and time as the board and the applicant may agree upon."

The Horse Racing Law also addresses horsemen's organizations. Section 19613 designates CTT as the representative for thoroughbred horse trainers, and Section 19613.1 addresses matters for negotiation with the racing associations, specifying certain topics and leaving others to CHRB discretion. The CHRB has issued rules addressing the horsemen's organizations and agreements (Rule 2040 et seq.). We address these and other statute sections and rules further in our discussion.

## B. *Underlying Events*

### 1. **Hollendorfer, CTT, and the Racing Associations**

Hollendorfer is a licensed thoroughbred horse trainer with around four decades of experience. He is a member of CTT. (§ 19613.)

The Stronach Group owns the racing associations at Santa Anita Park Racecourse (Los Angeles Turf Club Inc., I & II; LATC) and Golden Gate Fields (Pacific Racing Associations, Inc. I & II; PRA). The Del Mar Thoroughbred Club operates at the Del Mar Fairgrounds and Racetrack (DMTC; with LATC and PRA, the "Racing Associations").

CTT entered 2018-2019 RMAs with LATC and PRA respectively, and a summer 2019 RMA with DMTC. The RMAs have certain common provisions, and related Stall Applications. Section 5, which is incorporated in the Stall Application, provides the Racing Association can set procedures that limit participation for reasons that are not arbitrary and capricious (with decisions subject to CTT agreement). Section 6 has rules for stall assignments and

4

allocations, including a bar on arbitrary and capricious denials, and grievance procedures. Exhibit A has Stall Application language, with Section 1 reserving Racing Association discretion to deny applications (subject to CTT review, and with the final decision by the Racing Association).

### 2. The Racing Associations Deny Participation to Hollendorfer

There were numerous equine deaths at Stronach race meets in 2018 and 2019, leading to what Hollendorfer calls "intense . . . scrutiny" by the media and others. From December 2018 to June 2019, several horses died at Golden Gate. Hollendorfer trained two of these horses. During the same period, many more horses died at Santa Anita. Hollendorfer trained four of these horses, for a total of six equine deaths.

According to Hollendorfer's deposition, on or around June 22, 2019, Santa Anita management told him that he had to remove his horses from that track and Golden Gate Fields. The same day, Stronach issued a press release stating:

> "Individuals who do not embrace the new rules and safety measures that put horse and rider safety above all else, will have no place at any Stronach Group racetrack. We regret that Mr. Hollendorfer's record in recent months at both Santa Anita and Golden Gate Fields has become increasingly challenging and does not match the level of safety and accountability we demand. Effective immediately, Mr. Hollendorfer is no longer welcome to stable, race or train his horses at any of our facilities."

Hollendorfer filed a stall application for the 2019 Del Mar Summer Race Meet. On July 5, 2019, DMTC sent him a letter rejecting the application, which stated:

> "In addition to being constrained by a lack of space, we also must take into consideration all the relevant circumstances to ensure that no decision is made arbitrarily or capriciously. As we've discussed with you, in your case,

5

these circumstances include not only your long career, but also the recent actions taken by The Stronach Group and New York Racing Association, among other things. [¶] Based on our careful consideration of all these circumstances we regret to inform you that we are unable to grant your application . . . . Nor, under the circumstances, will we accept any racing entries for any horse where you are listed as the official trainer. We have the right to take such action under our stabling application, the terms of which you agreed to by submitting your application."

On September 26, 2019, Hollendorfer tried to enter a horse at a race meet at Santa Anita. A staff member advised him there was no change in status and they would not accept his entry.

### 3. Hollendorfer and CTT Seek Relief from CHRB and in Court

Hollendorfer's counsel sent letters to the CHRB in July and September 2019 regarding DMTC and LATC respectively. Each requested a hearing under Section 19573 and made a complaint under Rule 1765 (which provides for investigation of alleged misconduct by licensees). CHRB counsel forwarded the letters to its Chief Investigator, Shawn Loehr, who conducted investigations and determined the Racing Associations denied Hollendorfer participation under the RMAs and there were no CHRB rule violations.

CTT also filed complaints with the CHRB in July 2019, alleging DMTC's denial violated its RMA and Stronach's ban violated the RMAs for LATC and PRA. The CHRB assigned a hearing officer. CTT settled with DMTC and withdrew its complaint. In February 2020, the hearing officer issued a proposed decision that the LATC/PRA matter was moot because the RMAs had expired, which the CHRB adopted.

Hollendorfer and CTT filed actions in superior court as well, starting in July 2019, including a lawsuit against DMTC in San Diego Superior Court through which they obtained a preliminary injunction. They sued PRA in

6

Alameda Superior Court, and Hollendorfer filed an action against LATC in Los Angeles Superior Court (it is unclear if CTT joined). Hollendorfer states these cases have settled.

## C. *Litigation*

In May 2020, Hollendorfer filed a petition for writ of mandate and damages against the CHRB. His operative petition had three causes of action: (i) traditional mandate under Code of Civil Procedure section 1085; (ii) administrative mandate under Code of Civil Procedure section 1094.5; and (3) violation of Government Code section 815.6. He sought, inter alia, that the CHRB be ordered to (i) set a hearing under Section 19573 and (ii) direct the Racing Associations to take various actions involving the RMAs and to participate in hearings.

The parties filed briefs, submitted evidence, and lodged and supplemented the administrative record. Prior to the October 2022 hearing on his mandate claims, Hollendorfer filed a request to introduce live testimony from the executive director of CTT, which the court denied. In November 2022, the trial court issued an order denying the petition for writ of mandate.

In January 2023, the CHRB filed a motion for judgment on the pleadings on the Government Code section 815.6 claim, which Hollendorfer opposed. In June 2023, the trial court entered an order granting the motion.

The trial court entered judgment for the CHRB in July 2023. Hollendorfer timely appealed.

## III. DISCUSSION

Hollendorfer argues the trial court erred by denying his petition for writs of mandate, denying his request for live testimony, and granting

judgment on the pleadings for his Government Code section 815.6 claim. We reject these contentions.

## A. *Applicable Legal Standards*

### 1. **Statutory and Regulatory Interpretation**

"Interpretation of a statute or regulation is . . . an issue of law for the court [citations], as is the question whether a regulation is consistent with the authorizing statute [citations]. Thus, we must review the interpretations of the [agency] and the trial court de novo, and come to our own independent conclusions on these issues." (*Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1214.)

"Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 (*Concerned Communities*).)

A regulation also "must fit 'within the scope of authority conferred' by the Legislature." (*Association of California Ins. Companies v. Jones* (2017) 2 Cal.5th 376, 390; *In re Gadlin* (2020) 10 Cal.5th 915, 926 [regulations must be " 'consistent and not in conflict with' " statute].)

8

The courts take " 'ultimate responsibility for the construction of the statute,' " while according " 'great weight and respect to the administrative construction.' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12.)

### 2. General Appellate Review and Briefing Standards

It is a "well-established rule of appellate review that a judgment or order is presumed correct and the appellant has the burden of demonstrating prejudicial error." (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 348 (*Hotels Nevada*); see *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573-574 (*Soule*) ["judgment may not be reversed on appeal" absent a miscarriage of justice, citing Cal. Const., art. VI, § 13].)

An appellant's opening brief must "fairly set forth all the significant facts, not just those beneficial to the appellant." (*In re S.C.* (2006) 138 Cal.App.4th 396, 402.) It is also the appellant's burden to " 'identify and establish deficiencies in the evidence.' " (*Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1326 (*Holguin*).) Further, an appellant must raise all points in the opening brief, or forfeiture may result. (*Raceway Ford Cases* (2016) 2 Cal.5th 161, 178 (*Raceway*) ["We generally do not consider arguments raised for the first time in a reply brief."]; *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 693 (*Groundwater Cases*) ["Basic notions of fairness dictate that we decline to entertain arguments that a party has chosen to withhold until the filing of its reply brief, because this deprives the respondent of the opportunity to address them on appeal."].)

All briefing must be supported by reasoned argument, authority, and accurate citation to the record. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 (*Badie*) ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and

9

citations to authority, we treat the point as waived."]; *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 (*WFG National*) ["[W]e may decide that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record."].) Briefs must "[s]tate each point under a separate heading or subheading" as well. (Cal. Rules of Court, rule 8.204(a)(1)(B); *Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 (*Pizarro*) ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading."].)

Here, Hollendorfer's opening brief contains a largely one-sided description of the record; some arguments are repetitive and/or inadequately briefed; and he raises new points on reply. We address each properly-raised and briefed point once, in the place most logical for our discussion. His briefing has two further issues. He contends the CHRB concedes certain points by not addressing them. A "respondent's failure to address an issue raised in the opening brief" is "not a concession." (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 557, fn. 48 (*Golden Door*); cf. *Smith v. Smith* (2012) 208 Cal.App.4th 1074, 1078 [even when no respondent's brief is filed, appellant has an " 'affirmative burden to show error' "].) He also cites a trial court ruling in a different CHRB case as "persuasive and binding authority." Trial court orders have "no precedential value . . . ." (*Crab Addison, Inc. v. Superior Court* (2008) 169 Cal.App.4th 958, 963, fn. 3.)[2]

---

[2]     He asserts estoppel based on the trial court ruling too. The point concerns an issue we do not reach (Rule 1989), and would lack merit anyway; he fails to address the elements of estoppel, or show they are met.

## B. *Traditional Mandate*

The trial court denied Hollendorfer's traditional mandate claim because he did not establish a hearing was required under Section 19573. He does not show this ruling was erroneous, or any other reversible error.

### 1. Additional Facts

#### a. Request for Hearing and Complaint as to DMTC

Hollendorfer's counsel, Drew Couto, sent the request for hearing under Section 19573 and complaint under Rule 1765 on July 23, 2019. He identified DMTC's stated reasons for the exclusion (i.e., his long career, recent actions by Stronach and the New York Racing Association, its rights under the Stall Application, and "PR"), and said, "[a]t no time . . . did DMTC identify CHRB Rule 1989 . . . as a basis for his exclusion." (Italics omitted.) He also cited eight CHRB rules "upon which [the] request" was made.

CHRB counsel Robert Brodnik responded the next day, stating, in part, that the CHRB "will not grant a hearing on the basis of an association's action under Rule 1989." Couto responded by letter the same day, seeking clarification and other information.

The superior court issued its preliminary injunction in the DMTC case on July 26. CHRB counsel contacted Couto to ask if the issues raised in his July 23 letter still required CHRB attention. Couto responded with questions.

On July 30, Brodnik sent a letter to Couto that elaborated on the CHRB's position that Rule 1989 did not support a hearing under Section 19573. He concluded by stating, "If your complaint is based upon different grounds, or if you would like to clarify your position, please feel free to do so. Nevertheless, your initial letter has been forwarded to Chief Investigator Shawn Loehr for investigation."

11

### b. Loehr's Investigation into DMTC

Loehr conducted an investigation and prepared a report. We describe pertinent portions of his report, with additional detail from emails between him and Couto.

On July 31, 2019, Loehr sent Couto an email stating Brodnik forwarded his letter, and asking for the "specifics of [his] complaint," if different from Rule 1989. Couto responded the next day, citing the eight rules listed in his July 23 request, and they exchanged further emails.

Loehr contacted DMTC counsel on August 5. He met with their counsel and executives on August 8. DMTC said they had met with Hollendorfer and Couto on June 26, told him he could not race at Del Mar this summer, and explained the factors leading to that decision. DMTC said they relied on Section 1 of his Stall Application, and did not give him a rule section. They also said they did not exclude him under Rule 1989(b), he was never fully barred from Del Mar, and they proposed he transfer his horses to his assistant trainer.

Loehr also obtained DMTC documents, including the summer 2019 RMA and the Stall Application. He quoted Section 6 of the RMA, which stated in part that in the "allocation . . . of stall space," DMTC "will not discriminate in any way against any trainer . . . by way of any arbitrary or capricious" conduct. Loehr also obtained, among other things, DMTC's July 5 letter advising Hollendorfer that they decided not to allocate him stalls. Loehr noted he began transferring horses to his assistant trainer after July 5.

Later in August, Loehr emailed Couto, asking if it was his position that DMTC made its decision arbitrarily and/or capriciously and, if so, to provide his rationale. Couto responded a few days later. He raised concerns about CHRB's impartiality, and, citing court proceedings, said the CHRB "should

12

step back . . . at this time." They exchanged further emails about his concerns and the investigation status.

Loehr completed his report in October 2019. He noted he contacted Couto for his position on whether DMTC acted arbitrarily and capriciously, and he did not supply evidence that DMTC acted in this manner.

Loehr set forth his findings. Pertinent here, he found "DMTC made a business decision to not grant [Hollendorfer] stall space or allow him to enter horses during the Del Mar Summer Meet based on many factors," listing his "ban from Santa Anita and Golden Gate Fields," his "ban from the New York Racing Authority," "having a high percentage (15%) of horse fatalities at Santa Anita and Golden Gate Fields," a media story, a statement by CTT's president, and government pressure on the industry. He determined these factors did "not appear to fit within the definitions of arbitrary or capricious." He also determined "none of the specific CHRB rules alleged in the complaint . . . have been violated" by DMTC, and addressed each one.

### c. Loehr's Investigation into LATC

After Santa Anita rejected Hollendorfer's entry on September 26, 2019, Couto sent the CHRB another request for hearing under Section 19573 and complaint under Rule 1765 as to LATC. He argued the refusal to accept the entry violated four CHRB Rules. The letter did not mention Rule 1989.

Brodnik sent the complaint to Loehr the next day, September 27, and he again investigated and prepared a report. Loehr called Couto and asked if they had given him authority for the ban back in June 2019. Couto told him no authority was given and Rule 1989(b) was never stated.

Loehr also contacted LATC counsel on September 27, and had a meeting that afternoon in the LATC executive offices. They confirmed Hollendorfer's request to enter a horse at Santa Anita was denied. They

13

noted they were allowing horses to be entered under his assistant trainer's name. They explained the RMA and stall application gave them authority to deny stable space and refuse race entry, as long as the decision was not arbitrary and capricious. They also said he was banned from the facility, and that was the primary reason. When asked about the authority for the Stronach ban, they said they had not quoted it to Hollendorfer, but had "multiple authorities," stating they knew about Rule 1989(b); Santa Anita was private property, from which they could ban people; and, again, that the RMA and Stall Application provided authority.

Loehr also obtained LATC documents, including the 2018-2019 RMA and Stall Application. He then provided his findings, stating:

> "Both the Stall Application and the [RMA] give the [LATC] the authority to deny race entries as long as the decision is not 'arbitrary or capricious'. The LATC decision to deny [Hollendorfer's] entry is based upon his June 22, 2019 ban from all Stronach Group tracks. This specific complaint is not about the ban, but about the denial of Mr. Hollendorfer's attempt to enter a horse. Because, [he] is banned from Santa Anita, the denial of [his] entry at Santa Anita does not appear to be arbitrary or capricious."

As with the DMTC investigation, Loehr determined none of the rules cited in the complaint were violated, and addressed each one.

### d. CHRB Letters

In early October 2019, CHRB counsel Brodnik sent Couto letters as to DMTC and LATC, each stating the CHRB "conducted a thorough investigation" and found no rule violations. Couto asked for elaboration. Later that month, Brodnik sent Couto a further letter as to DMTC, addressing the eight rules cited in his complaint and explaining why DMTC did not violate them. In December 2019, Couto sent an email to the CHRB's

14

executive director and others, raising various concerns.  Hollendorfer represents he did not receive a response.

### e. Trial Court Ruling

The trial court explained that Hollendorfer contended the CHRB "had a mandatory duty to hold a hearing after [he] was excluded" by the Racing Associations, and it quoted the first sentence of section 19573 (" 'Any person who, pursuant to a rule of the board, is excluded . . . .' ").  The court noted that CHRB's counsel referenced Rule 1989 in his July 24 response, but found each complaint was "referred to an investigator who determined [the] complaint was unfounded."  The court said it reviewed the lodged records and considered counsel arguments, and found Hollendorfer "has not sufficiently demonstrated a hearing was required pursuant to [section] 19573."  The court also rejected his claim that the CRHB's "actions were 'tainted by pervasive bias and conflicts of interest,' " stating, "[R]egardless of the existence or non-existence of the alleged biases and conflicts of interests, [he] has failed to demonstrate they influenced or impacted [CHRB's] investigations in any way."

### 2. Additional Law Regarding Traditional Mandate

A traditional writ of mandate "may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins."  (Code Civ. Proc., § 1085, subd. (a).)

To obtain relief, a petitioner must show " ' "(1) A clear, present and usually ministerial duty on the part of the respondent . . . ; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty." ' "  (*CV Amalgamated LLC v. City of Chula Vista* (2022) 82 Cal.App.5th 265, 278 (*CV Amalgamated*).)

A court " 'may issue a writ of mandate to compel a public agency or officer to perform a mandatory duty.' " (*CV Amalgamated, supra*, 82 Cal.App.5th at p. 279.) "Often, the crucial issue . . . is whether the act . . . is a mandatory and ministerial duty, or . . . a quasi-legislative and discretionary act." (*Ibid.*, italics omitted; see *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916 (*Kavanaugh*) [" 'A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists.' "].)

A court may also "issue a writ when a public agency has abused its discretion in carrying out a discretionary function." (*CV Amalgamated, supra*, 82 Cal.App.5th at p. 279, italics omitted; *id.* at p. 280 [judicial inquiry addresses whether " 'action was arbitrary, capricious or entirely without evidentiary support, and whether it failed to conform to procedures required by law' "].) "Normally, mandate will not lie to control a public agency's discretion, that is to say, force the exercise of discretion in a particular manner. However, it will lie to correct abuses of discretion." (*County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 654.)

When an " 'appellate court reviews a trial court's judgment on a petition for a traditional writ of mandate, it applies the substantial evidence test to the trial court's findings of fact and independently reviews the trial court's conclusions on questions of law, which include the interpretation of a statute and its application to undisputed facts.' " (*CV Amalgamated, supra*, 82 Cal.App.5th at p. 280.)

16

### 3. Hollendorfer Does Not Establish the CHRB Had a Mandatory Duty Under Section 19573 to Hold a Hearing Here

#### a. *Section 19573*

We begin with a threshold statutory interpretation question: when, if ever, does Section 19573 require a hearing? We conclude an exclusion based on a CHRB rule is a necessary predicate to any hearing requirement under Section 19573. We further conclude the CHRB decides if there is a qualifying exclusion, and has discretion over how to reach that determination.[3]

Section 19573 states: "Any person who, pursuant to a rule of the board, is excluded or ejected from any inclosure where horse racing is authorized may apply to the board for a hearing on the question of whether the rule is applicable to him. [¶] The board shall hold the hearing either at its next regular meeting . . . or at such other place and time as the board and the applicant may agree upon. [¶] If, upon the hearing, the board determines that the rule does not or should not apply to the applicant, it shall notify all [track operators] . . . of such determination. [¶] If the board determines that the exclusion or ejection was proper, it shall make . . . an order to that effect." (See § 19404 [board means CHRB].)

First, the plain language of Section 19573 reflects its focus is on rule-based exclusions only. It states "[a]ny person who, pursuant to a rule of the

---

[3] We note neither party supplied legislative history, but as we shall explain, certain language is clear and, for the potential ambiguity implicated by the facts here (who decides if there was a qualifying exclusion, and how), there is essentially one reasonable interpretation (the CHRB, in its discretion). We also note that although Hollendorfer mentions Rule 1983 (allowing hearing applications by excluded members of banned classes), he did not cite it in his requests to the CHRB and does not provide substantive analysis here. We do not address it further.

board, is excluded" from a racing inclosure may apply for a hearing—not just any person. It also states the hearing concerns whether the "rule is applicable" and whether the "rule does not or should not apply"—not just if an exclusion, or any other denial of participation, was sound or fair.

Thus, even if the phrase "shall hold the hearing" were mandatory (an issue on which the parties disagree), it does not support entitlement to a hearing when, as here, there was no rule-based exclusion in the first place. (Cf. *Kavanaugh, supra,* 29 Cal.4th at p. 916 [ministerial act is required "when a given state of facts exists"]; see *Greenberg v. Hollywood Turf Club* (1970) 7 Cal.App.3d 968, 980 (*Greenberg*) [rejecting plaintiff's claim that the CHRB "should hold a hearing to determine if a racing association has acted properly in excluding a person for any reason," stating, "We find nothing in the applicable statutes or . . . regulations . . . , which declares the existence of any such right."].)[4]

Second, Section 19573 is silent as to who decides if an exclusion was rule-based, and how. We conclude the most reasonable interpretation, if not the only one, is that the CHRB must determine if there was a qualifying exclusion and how it does so is within its discretion.

Starting with the text of Section 19573, the phrase "may apply to the [CHRB] for a hearing" implies the CHRB decides whether to grant the application—and that decision requires the CHRB to determine if a qualifying exclusion occurred. Turning to the statutory context, Sections 19440 and 19562 place broad authority in the CHRB to set and administer

---

[4]    See also *Richardson v. Department of Motor Vehicles* (2018) 25 Cal.App.5th 102, 110-113 (although Vehicle Code required DMV to revoke driving privileges *once* it determined a person could not safely operate a vehicle, it had discretion to determine *whether* person was safe to drive).

the rules for horse racing. Section 19572, which directly precedes Section 19573, specifically states the CHRB "may, by rule, provide for the exclusion . . . from any inclosure where horse races are authorized," and it has adopted such rules. (Rule 1980 et seq.) It is fully consistent with this statutory scheme for the CHRB to be the entity to decide if a rule-based exclusion occurred. The CHRB is also in the best position to determine what *did* happen, not what a person seeking a hearing (or an entity seeking to avoid one) claimed happened.

For similar reasons, we conclude the CHRB has discretion over how to determine if there was a qualifying exclusion. Here, there was no material dispute as to why Hollendorfer was denied participation (i.e., under the RMAs and Stronach ban), and the CHRB conducted investigations that concluded with letter determinations. But one can envision other scenarios, like the person and entity disagreeing on the facts (or both claiming without evidence a rule was applied), which could implicate different approaches. We see no basis to limit the CHRB's flexibility in this regard.[5]

---

[5]    Hollendorfer notes *Greenberg* said that if the plaintiff there asserted he was excluded under a CHRB rule, he "would have been entitled to a hearing." (*Greenberg, supra*, 7 Cal.App.3d at p. 980.) Even if this were not dicta, there is no indication the court was considering the interpretation issues before us. (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 85, fn. 4 [" '[C]ases are not authority for propositions that are not considered.' "].) We note the CHRB contends, inter alia, that no "predicate rule violation was found to justify a hearing," and "excluded" in Section 19573 refers to barred classes under Section 19572 and Rule 1980. It is unclear if they are suggesting a person would have to prove a violation, of certain rules, to obtain a hearing (rather than having a rule-based exclusion, proper or not). We need not address this further here, as Hollendorfer was not excluded under a rule at all.

19

Hollendorfer maintains he is entitled to a hearing under Section 19573. We are not persuaded.

First, Hollendorfer argues Section 19573 "mandate[s] if requested . . . a hearing on the question of the applicability of 'a rule' . . . to any person excluded," citing *Morton v. Hollywood Park, Inc.* (1977) 73 Cal.App.3d 248 (*Morton*). To the extent he means it suffices merely to ask about rule applicability, we disagree. Section 19573 applies to someone excluded "pursuant to a rule," not any person unable to access a race meet who queries whether a rule relates to their situation. Given the breadth of CHRB regulation, that could cover nearly *any* situation, rendering the phrase "pursuant to a rule" a nullity. (Cf. *O.G. v. Superior Court* (2021) 11 Cal.5th 82, 98 [" 'An interpretation that renders statutory language a nullity is obviously to be avoided' "].)

*Morton* did not hold otherwise. There, a racing association removed the plaintiff under Rules 1980 and 1990 (a predecessor to Rule 1989). (*Morton, supra*, 73 Cal.App.3d at pp. 251-252.) He sought a hearing, the state's attorney did not obtain evidence he was excluded under Rule 1980, and told him removal under Rule 1990 was a private matter. (*Morton*, at p. 252.) He sued for injunctive relief and damages, and the Court of Appeal affirmed the dismissal of his case. (*Id.* at pp. 252-254.) It explained that by "acquiescing in that attorney's advice," he failed to exhaust available remedies via a writ petition under Code of Civil Procedure section 1085. (*Morton*, at p. 254.) The court noted "Section 19573 provides for a hearing on the question of the applicability of 'a' rule to any person excluded or ejected," not just Rule 1980. (*Morton*, at p. 254.) Thus, *Morton* still involved a *rule*-based removal, and focused on exhaustion regardless.

Second, Hollendorfer argues that under Section 19431, the CHRB can only take official actions with a four-member vote, further evidencing that Section 19573 provides a hearing. Section 19431, subdivision (c) states: "At least four members of the board shall concur in the taking of any official action or in the exercise of any of the board's duties, powers, or functions." If he is objecting to a staff investigation of hearing entitlement, we are not persuaded. The CHRB oversees all horse racing in the state; by defining what requires a four-member concurrence, this section implies there are situations that do not require one. (See, e.g., §§ 19427 [appointment of employees], 19440, subd. (b) [delegation to stewards], 19613.1 [matters covered by agreements].) This argument seems to either ignore the "may apply to the [CHRB] for a hearing" language in Section 19573, or to assume the decision whether to grant that hearing is an official action.

Third, Hollendorfer expressly disputes the investigation was a "valid administrative action[ ]," contending the CHRB "failed to demonstrate" there were "any lawful delegations of powers or duties to . . . staff members," citing Sections 19400, 19420, 19431, and 19440.[6] But he provides no substantive analysis as to how these sections limit CHRB discretion under Section 19573 to use an investigator. Only section 19440 discusses delegation, and none focus on staff. Further, Rule 1765, which Hollendorfer cited in his complaints, contemplates the use of investigators. (Rule 1765 [complaints

---

[6] See Sections 19400 (statute's title is Horse Racing Law), 19420 (placing jurisdiction over horse racing with the CHRB), 19431 (CHRB offices, records, and voting), and 19440 (CHRB responsibilities and delegation).

21

described therein "shall be referred to the [CHRB] and investigated by the [CRHB] *or its investigators*" (italics added)].)[7]

Fourth, Hollendorfer belatedly contends on reply that an investigation does not satisfy due process, citing *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197 and *Jamgotchian v. Ferraro* (9th Cir. 2024) 93 F.4th 1150. Even if the point were not forfeited, the cases do not establish an investigation is inadequate for the purpose at issue here: determination of hearing entitlement. Indeed, *Today's Fresh* confirms the "precise dictates of due process are flexible and vary according to context." (*Today*'s *Fresh*, at p. 212; see *id*. at p. 228 [" '[i]n general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action' "; "no presumption in favor" of a full hearing].) As for *Jamgotchian*, it involved state claim exhaustion and is inapposite. (*Jamgotchian*, at pp. 1152, 1154, 1158 [CHRB affirmed steward decision after hearing; district court erred by concluding that decision, in "combination with [plaintiff] not seeking review . . . in state court," precluded federal constitutional claim].)

Finally, Hollendorfer asserts the "mandatory nature of the hearing requirement is even more compelling" when the situation involves a "licensed trainer" with vested constitutional rights. He explains trainers "have a property interest in their licenses" sufficient to invoke due process, citing *Barry v. Barchi* (1979) 443 U.S. 55 (*Barry*), and the state "may not hinder a licensee's vested right to practice their profession, without due process," citing *Bixby v. Pierno* (1971) 4 Cal.3d 130. It was the Racing Associations who denied his participation, not the CHRB; he does not establish the denials

---

[7] Hollendorfer also argues an "investigator's responsibility" is "only to gather pertinent facts," citing Section 19431 and *Morton*. Neither addresses investigators.

22

amounted to a revocation of his license; and, regardless, he does not explain why this would implicate Section 19573.  (See *Tisher v. California Horse Racing Bd.* (1991) 231 Cal.App.3d 349, 355 (*Tisher*) [*Bixby* "does not support a conclusion plaintiffs have a vested, fundamental right to utilize their licenses at Los Alamitos, a private racetrack"]; see further discussion of revocation issue and *Tisher*, *post*; see § 19461 [addressing proceedings governing license revocation by the CHRB].)  The cases cited by Hollendorfer involve different contexts or issues, and do not aid him.  (See *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1260 [rejecting reliance on "generic authorities" regarding due process and cases, including *Bixby*, for which appellant supplied "little, if any, explanation of their relevance" to his case].)[8]

Hollendorfer also contends the CHRB's position "affords more rights to individuals suspected of engaging in immoral conduct" than licensees. (Capitalization omitted.)  We disagree.  "Any person" excluded pursuant to a CHRB rule can apply for a hearing under Section 19573, and licensees may *also* have avenues for relief not available to the public.  For example, they may be able to pursue grievances via their horsemen's organizations or file civil litigation, both approaches taken by Hollendorfer here.  (Cf. *Flores v. Los Angeles Turf Club, Inc.* (1961) 55 Cal.2d 736, 748 ["An administrative remedy

---

8    See *Barry, supra*, 443 U.S. at pp. 57-61, 63-66, 68 (state did not violate due process by suspending trainer's license without a predeprivation hearing, based on an expert finding that horse had drugs in its system, but the authorizing statute did violate his rights by not "assur[ing] a prompt postsuspension hearing"); *Bixby, supra*, 4 Cal.3d at pp. 146-147 (independent judgment review applies to agency action when a vested right, like the right to practice one's profession, is involved); see also, e.g., *Dare v. Board of Medical Examiners* (1943) 21 Cal.2d 790, 799-801 (upholding use of independent judgment review in license revocation case).

is not rendered inadequate by the fact that a particular applicant cannot qualify for relief under it."].)

### b. Investigation Findings

We now turn to the CHRB's findings, and conclude they support the conclusion that no hearing was due here under Section 19573.

Loehr found, inter alia, that each Racing Association could deny Hollendorfer entry under the RMA, so long as the determination was not arbitrary and capricious; DMTC relied on reasons including the Stronach ban and high percentage of horse deaths; and LATC, a Stronach entity, relied on the existing ban. These findings reflect Hollendorfer was not excluded "pursuant to a rule of the board," and thus was not a person who "may apply" for a hearing under Section 19573.

Hollendorfer does not establish otherwise.

First, Hollendorfer argues that when CHRB "incorrectly assumed" he was excluded under Rule 1989, this "assumption should have . . . afforded" him a hearing. We disagree. The CHRB's discretion over how to determine if there was a rule-based exclusion reasonably includes deciding *when* the determination process has concluded. Hollendorfer provides no reason to limit this discretion by requiring the CHRB to treat an initial response as a decision. Indeed, doing so could chill communication and impede issue resolution. We need not and do not reach his remaining arguments regarding Rule 1989, including his reliance on *Fipke v. California Horse Racing Bd.* (2020) 55 Cal.App.5th 505, 516 in this regard.

Second, despite Hollendorfer's concession that Loehr's investigation "unequivocally revealed" he was "excluded based on the . . . . RMAs," he claims the investigation "identified Rules 2040 (Horsemen's Organizations) and 2041 (Agreements Binding on Members) as providing contractual/RMA

24

justification" for his exclusion.  Loehr did not identify Rule 2040 in either report.  He did mention Rule 2041 in the DMTC report, but only in a concluding section where he addressed the "specific CHRB [rule] sections alleged" by Couto.  Hollendorfer relatedly contends the CHRB knew or should have known his exclusion violated Rules 1542 (Power to Refuse Entry and Deny Eligibility) and 2045 (Prohibited Provisions of Horsemen's Agreements), and it was also inconsistent with Rule 1510 (Knowledge of Rules).

To the extent Hollendorfer cites these rules to suggest there was a rule-based exclusion because he was denied participation under RMAs governed by CHRB rules (or in alleged violation of them), we disagree.  We view this as a variation of his claim that one can seek a hearing on "applicability of 'a rule,' " without more, which we addressed and rejected above.[9]

Third, Hollendorfer criticizes the investigation generally, including based on purported delays in its commencement and Loehr's deposition testimony reflecting an alleged lack of experience in horse racing investigations and familiarity with the rules.  But he does not explain how these issues, even if substantiated, could have impacted the investigation findings, and thus cannot establish prejudicial error.  (*Hotels Nevada, supra*, 203 Cal.App.4th at p. 348; *Soule, supra*, 8 Cal.4th at pp. 573-574.)  Nor does the record support his concerns.  CHRB counsel responded promptly to the initial complaint, and Loehr started investigating each complaint within a day of receiving it.  As for Loehr's background, he had prior experience in a different agency; he explained his staff had never "investigated violations of

---

[9]    To the extent Hollendorfer cites additional rules on reply, including in connection with his arguments contesting the RMA race meet provisions (see *post*), we deem those points forfeited.

these particular sections" either, and because the complaint was unique and complicated, it made sense for him to do it; and his reports addressed every rule cited in the complaints.

### c. Fair Procedure

Hollendorfer also argued in his opening brief that a hearing was required under the common law doctrine of fair procedure, which, he stated, "protects against arbitrary decisions by private organizations that effectively deprive an individual of their ability to practice a . . . profession . . . ." He contended, in part, that the CHRB was "well aware of its obligations," citing an email from CHRB Chairman Charles Winner, and yet "failed to convene the hearing mandated by law" and was "complicit" in letting the ban occur. In its respondent's brief, the CHRB emphasized the fair procedure doctrine applies only to private entities. (See *Potvin v. Metropolitan Life Ins. Co.* (2000) 22 Cal.4th 1060, 1066.) On reply, Hollendorfer says he "generally agrees," but argues the CHRB was "held to the higher standard of due process" and it "cannot shield its own failure to provide due process" by ceding authority to Racing Associations that it knew "had failed to afford . . . [f]air [p]rocedure."

Hollendorfer's contentions here, belated and otherwise, lack merit. For one thing, the Winner email does not help him. On June 22, 2019, an individual at Stronach sent Winner and others at the CHRB a press release from Los Alamitos Race Course that stated they would " 'gladly provide stalls' " to Hollendorfer and " '[u]nless forbidden by the [CHRB], . . . intend to permit entries' " from him. Winner responded, stating, "We will simply respond to the media, if asked, that it is a los al [*sic*]. The chrb would have to abide by due process laws." Although his meaning is not fully clear, he appears to confirm CHRB *would* provide applicable due process. Further,

26

Hollendorfer essentially concedes the fair procedure doctrine does not apply directly to the CHRB, and supplies no legal authority establishing that fair procedure violations by the Racing Associations support a due process violation by the CHRB (much less a specific right to a hearing under Section 19573).

### 4. Hollendorfer Does Not Establish Grounds for Traditional Writ Relief Based on the RMAs

Hollendorfer also argues, in substance, that it was improper for the CHRB to let the Racing Associations use RMA provisions to limit his participation, which allowed them to essentially revoke his license and ban him from racing. We are not persuaded.

Before we proceed, we clarify the scope of our analysis. Hollendorfer focuses on the alleged impropriety and application of the RMA provisions. He does not show any lack of record support for Loehr's findings that the Racing Associations did not act arbitrarily or capriciously under the RMAs, or the findings that no CHRB rules were violated. His speculation elsewhere as to bias or conflicts of interest does not suffice. He forfeits any challenge in these respects. (*Holguin, supra*, 229 Cal.App.4th at p. 1326; see *ibid.* [claim of insufficient evidence is deemed waived unless appellant sets forth " ' "all the material evidence on the point" ' " (italics omitted)].)

It is also unclear if Hollendorfer means the RMA issues further support a hearing under Section 19573, or are separate grounds for writ relief. If the former, we disagree for the reasons discussed above. If the latter, he does not articulate his reasoning, and forfeits this issue too. (Cf. *Badie, supra*, 67 Cal.App.4th at pp. 784-785.) Even if he preserved some objection to the RMA provisions, his contentions lack force.

First, Hollendorfer argues that by allowing RMAs that permit denial of race meet applications, the CHRB improperly delegated its authority over

race participation to the Racing Associations, in contravention of Section 19440 and Rule 2045. We disagree.

We start with Section 19440, subdivision (a). It states the CHRB "shall have all powers necessary and proper" to carry out the purposes of the Horse Racing Law, and sets forth broad responsibilities not only to participants, but also racehorses and the public.[10] Subdivision (b) states it "may delegate to stewards . . . any of its powers and duties." But the Horse Racing Law also allows for RMAs. Section 19613.1 addresses "negotiation and contract" matters for the trainer and owner organizations. It provides the trainer organization "shall generally be responsible for negotiating issues relating to the backstretch, track safety, and the welfare of backstretch employees"; the owner organization negotiates other identified matters (e.g., purse agreements); and, otherwise, the CHRB "shall determine which matters . . . shall be the subject of negotiation and contract" for each organization.

Thus, the Horse Racing Law contemplates the RMAs will address certain issues, separate and aside from steward delegations under Section 19440—and that the CHRB will decide what additional matters will be the subject of negotiation. (§ 19613.1.) Consistent with these provisions, the CHRB contends here that while it has "oversight authority and must approve each RMA . . . , once approved, it is essentially a private contract," and RMAs are "carefully negotiated between the CTT and the racing associations to set the terms by which racing associations allow trainers to apply to stable horses at the track." The CHRB could reasonably conclude that allowing

---

10    (See subd. (a)(1) [ "[a]dopting rules . . . that protect . . . the health, safety, welfare, and aftercare of racehorses"], (2) [protection of public], (3) ["[a]dministration and enforcement of all laws, rules, and regulations affecting horse racing"], (4) ["[a]djudication of controversies"], (5) [licensing] & (6) [allocation of racing dates].)

28

RMA provisions addressing race meet entries is consistent with its fulfillment of its responsibilities under Sections 19440 and 19613.1.

As for Rule 2045, Hollendorfer argues it prohibits RMA provisions " 'which may serve to exclude participation at the meeting by any individual holding a valid license,' " selectively quoting from the rule and omitting key language. The rule states in relevant part:

> "No agreement between the association and the horsemen shall include provisions which are in conflict with the Horse Racing Law, the rules of the [CHRB], or usurp the authority of the [CHRB], including but not limited to: . . . (4) Provisions which may serve to exclude participation at the meeting by any individual holding a valid license issued by the [CHRB]. *Nothing herein is deemed an abridgment of Rules 1485* and 1989 of this division." (Italics added.)

Rule 1485, subdivision (c) states, "Possession of a license does not confer any right upon the holder thereof to employment at or participation in a race meeting or to be within the inclosure." Further, Rule 1437 states a racing association "may impose conditions for its race meeting as it may deem necessary," provided they "may not conflict" with CHRB rules. (*Ibid.* [association "may also impose requirements, qualifications or requisites"].)

Considering these provisions together, as we must, we conclude Rule 2045 imposes no bar on RMA provisions governing race meet participation, so long as they are otherwise consistent with the Horse Racing Law and CHRB rules. (Cf. *Concerned Communities, supra*, 34 Cal.4th at p. 737 [text is examined in the "context of the statutory framework as a whole," including to "harmonize the various parts of the enactment"].) Indeed, barring such provisions could essentially *mandate* participation for licensed horsemen, obviating Rule 1485(c) in whole and Rule 1437 in part (and render somewhat superfluous the Rule 1485 reference in Rule 2045). (Cf. *People v. Valencia*

(2017) 3 Cal.5th 347, 357 [" '[a] construction making some words surplusage is to be avoided' "].)

Hollendorfer relies on other rules as well, to no avail. For example, he states that "only" the stewards "were authorized to refuse a race entry," citing Rule 1542 and, on reply, that CHRB had "exclusive authority" to accept entries under Rule 1580. He forfeits the latter issue, and neither rule limits RMAs regardless. (Rules 1542 [stewards may refuse entry for good cause], 1580 [all entries are under supervision of stewards, and they may refuse entries].) We note Loehr rejected his reliance on these rules, finding the RMAs and Stall Applications "give . . . authority to make stall and race entry decisions."[11]

Second, Hollendorfer argues that by rejecting his participation, the Racing Associations "effectively revok[ed] his license," which only the CHRB can do (thus "usurping" CHRB authority). We are not persuaded. As an initial matter, he remains a licensed horse trainer, and this case involves specific racing associations and race meets (i.e., 2018-2019 race meet

---

[11] Hollendorfer also invokes Rules 1402 and 1437. Rule 1402 states in part that CHRB rules "supersede" race conditions, which, if anything, confirms such conditions can exist. Rule 1437 likewise permits race conditions, as noted. He further argues elsewhere that an agency cannot adopt a rule that " ' "exceeds the scope of . . . the enabling statute," ' " but the rule he focuses on is Rule 1989, which we do not reach. For its part, the CHRB maintains we should defer to its interpretations. We need not address that general issue, as Hollendorfer establishes no error by the CHRB here, and we comment on any concerns with its views as warranted for our analysis.

exclusions by LATC and PRA (owned by Stronach) and DMTC). He cites no evidence in the record regarding other race meets.[12]

His theory lacks merit regardless, and *Tisher* is instructive. There, harness racers challenged standards imposed by Los Alamitos Racing Association (LARA) that effectively precluded their entry. (*Tisher, supra*, 231 Cal.App.3d at pp. 351-352.) Affirming judgment for LARA, the Court of Appeal acknowledged that only the CHRB can revoke licenses under Section 19440, but disagreed LARA's restrictions essentially " 'invalidated' their licenses" or were otherwise illegal. (*Tisher*, at p. 355.) The court explained:

> "[L]icenses '[a]re subject to all rules, regulations, and conditions from time to time prescribed by the board.' (§ 19460, subd. (b).) One of these regulations is that a racing association 'may impose conditions for its race meeting as it may deem necessary.' ([Rule] 1437.) Another is that '[p]ossession of a license does not, as such, confer any right upon the holder thereof to employment at or participation in a race meeting.' ([Rule] 1485(c).) In other words, LARA has the right to impose conditions on the drivers in its race meetings and plaintiffs have no absolute right to participate in those race meetings by virtue of the valid licenses they possess." (*Ibid.*)

The *Tisher* court also concluded LARA's race conditions "did not infringe on the board's sole power to suspend or revoke plaintiffs' licenses." (*Ibid.*)

Thus, *Tisher* confirms licensees *can* be subject to race limits, consistent with our analysis above. (See also *Morrison v. California Horse Racing Bd.* (1988) 205 Cal.App.3d 211, 218, 220 [previously convicted owner "could not

---

12    His claim in his fact section that he previously trained "upwards of 180 horses daily in California," and now trains around ten, is unsupported by record citations. He also does not address Loehr's finding that horses could be, and were, entered via his assistant trainer, or explain the Los Alamitos press release, noted above, which indicated they would accept his entries.

reasonably rely" on an owner's license to prevent exclusion, as it is "clearly within the contemplation of the [CHRB] rules that a licensed owner might not be permitted"].)

Finally, Hollendorfer contends he was "summarily precluded from practicing his profession" due to the "quasi-monopoly" of the Racing Associations, citing *Greenberg*. He has not established he was so precluded, and *Greenberg* does not help him. There, a stable agent was excluded without explanation, and the track later relied on its status as a property owner. (*Greenberg, supra*, 7 Cal.App.3d at p. 978.) The Court of Appeal held, in part, that he could state claims for interference with contract and prospective economic advantage, and there addressed the quasi-monopoly nature of horse racing. (*Id.* at p. 976.) It did not hold racing associations cannot impose race meet conditions (and elsewhere held, as noted, that not every exclusion supported a hearing). (See *id.* at p. 980; *Tisher, supra*, 231 Cal.App.3d at p. 360 ["*Greenberg* does not support [plaintiff's] claim of right to utilize their licenses . . . , free of LARA's restrictions"; noting the plaintiff there was "singled out and arbitrarily excluded . . . *without any reason*" (italics added)].)

On reply, Hollendorfer argues that if the CHRB permits "racing associations to determine . . . which licensees may . . . participate in race meets, then there is no need for State/CHRB licensing." We reject this hyperbole. It is both consistent with the Horse Racing Law and reasonable for the CHRB to oversee who can participate in race meets *at all*, including through licensing, and to permit other entities and persons to operate particular components subject to oversight.

32

### 5. Remaining Arguments

We address two remaining issues. First, Hollendorfer argues that despite raising various issues in his petition, the trial court's ruling was limited to the Section 19573 hearing issue; other issues, which he lists, continue to have merit; and, because the CHRB's brief did not address the trial court's failure to consider them, we should at least remand for further proceedings. We see no basis for remand.

Hollendorfer cites no authority requiring the trial court to expressly address every point in his writ petition. Nor is the CHRB's discussion, or lack thereof, dispositive. (*Golden Door, supra*, 50 Cal.App.5th at p. 557, fn. 48 [lack of response is not a concession].) If he believes other issues reflect prejudicial error, he must show this, and a list of purportedly unaddressed points does not suffice. (*Hotels Nevada, supra*, 203 Cal.App.4th at p. 348; *Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 771 [rejecting appellant's "attempt to throw the burden on respondent and this court to disprove . . . that the [b]oard, and the trial court, acted without proper support"; "That is not how the appellate process works."].) We note he does discuss many of these issues elsewhere, and where he has properly briefed them, we address them.

Second, Hollendorfer argues the trial court "improperly excluded and failed to consider . . . evidence establishing bias, conflicts of interest, and predetermination which . . . supported [his] writ allegations." He provides no legal or record support for this point, and we deem it forfeited. (*Badie, supra*, 67 Cal.App.4th at pp. 784-785; *WFG National, supra*, 51 Cal.App.5th at p. 894.) He also does not address the court's finding that he "failed to demonstrate" any "alleged biases or conflicts of interest" influenced the

33

investigations, or explain how the supposedly excluded evidence could have altered this ruling or otherwise supported the relief he sought.[13]

## C. *Administrative Mandate*

The trial court denied Hollendorfer's administrative mandate claim on standing grounds. He does not establish reversible error here, either.

### 1. Additional Facts

#### a. RMA Provisions

As we shall explain, the administrative proceedings concerned CTT complaints alleging the Racing Associations violated the RMAs. We describe Sections 5 and 6 here, and additional provisions as needed *post*. The "track" referenced here is the applicable Racing Association. Section 5 states:

> "Track may, in its discretion, establish rules, regulations, and security procedures that may limit or eliminate Applicant's ability to participate in racing or training activities at Track . . . , subject to the agreement of the CTT. The agreement of CTT shall be a condition precedent to any execution of a decision by Track to limit or eliminate Applicant's ability to participate in racing or training activities at Track . . . ."

Section 6 bars the Racing Association from discriminating against a trainer by arbitrarily and capriciously allocating stall space, as noted above. It then states:

> "If any trainer asserts that Track shall have so discriminated on such ground or grounds, then the trainer claiming to be so aggrieved may submit his claim to Track

---

[13] Hollendorfer also summarily claims the CHRB failed to immediately investigate CTT's complaints due to bias and conflicts of interest, and forfeits that point too. We note his factual background states his counsel sent a letter to CHRB counsel alleging bias and there were press accounts, but even if he discussed these matters in his arguments, they would not support reversal for the reasons stated.

or to CTT for examination, and if CTT shall then believe the claim to have merit, CTT shall be entitled to present the merits of the grievance on behalf of such trainer to Track. If the dispute is not settled, Track and CTT agree that the matter is to proceed immediately to arbitration before a hearing officer chosen by mutual consent by Track and CTT. If Track and CTT cannot agree on a hearing officer chosen by mutual consent, a hearing officer shall be appointed by the CHRB."

### b. DMTC Proceedings

On July 12, 2019, one week after DMTC denied Hollendorfer's stall application, CTT's counsel Darrell Vienna filed a letter complaint with the CHRB alleging DMTC violated Section 5 of the RMA. The complaint cited Rule 2043 (Adjudication of Controversies Relating to Agreements), which provides:

> "A complaint alleging a violation of any provision of an agreement between a horsemen's organization and a racing association may be filed with the [CHRB] by either of the contracting entities. The [CHRB] shall immediately investigate the allegations and may refer . . . the matter for hearing . . . . The . . . referee may, after hearing the matters alleged, order compliance with the terms of the contract if within their authority to do so, or propose to the Board a decision or other course of action including therein their recommendations to the Board."

Hollendorfer and CTT filed their superior court action against DMTC on July 15, asserting claims for declaratory relief and breach of contract. When the superior court issued a preliminary injunction, CHRB counsel John McDonough contacted Vienna to see if the DMTC complaint still required CHRB attention, and followed up after he did not respond. The CHRB appointed a hearing officer at some point.

Vienna subsequently notified the hearing officer that CTT and DMTC settled their dispute and CTT was withdrawing its complaint.

35

### c. LATC/PRA Proceedings

Stronach issued its press release stating Hollendorfer was no longer welcome at its facilities on June 22, 2019. On July 24, CTT counsel Vienna filed a letter complaint with the CHRB alleging Stronach violated the RMAs with LATC and PRA. CTT and Hollendorfer filed their lawsuit against PRA on August 12. On August 13, CHRB counsel McDonough acknowledged CTT's administrative complaint.

The CHRB appointed a hearing officer. On September 26, he issued a briefing sequence order with dates in November and December, and said a "hearing will be scheduled . . . if . . . deemed necessary."

The hearing officer issued his proposed decision in February 2020, stating the dispute was "appropriate for disposition without . . . a hearing." He explained the dispute involved interpretation of the RMAs; identified the documents in evidence, including the RMAs and Stronach press release; and granted LATC and PRA's request for judicial notice of orders in the superior court actions. He found the RMAs spanned December 26, 2018 to December 25, 2019, and appeared identical.

The hearing officer explained CTT alleged the " 'unilateral decision . . . to eliminate [Hollendorfer's] participation' " violated Section 5 of the RMAs. He stated Rule 2043 governed the matter, and CTT had to prove the RMAs were violated by a preponderance of the evidence.

The hearing officer then determined any RMA violation was moot, because the RMAs applied only to the period ending December 25, 2019, had expired, and were no longer enforceable, so there was no actual controversy and CTT "improperly seeks redress for 'past wrongs.' " He noted Rule 2043 also requires a controversy, and he could not order compliance with unenforceable provisions. He also disagreed with CTT that the dispute was a

matter of public interest that was likely to recur. He stated it concerned factual issues particular to the RMAs at issue and whether LATC/PRA had to obtain CTT's consent under Section 5, which were not "issues of broad public interest." He further stated "any future dispute" would "concern whatever [RMA] is in place" at the time.

He concluded CTT's "remedy . . . , as it relates to the [RMAs], is to pursue a fully matured claim for breach of contract, if such a claim exists," and recommended the dispute be dismissed. The CHRB adopted his decision later that month.

### d. Trial Court Ruling

The trial court denied Hollendorfer's administrative mandate claim due to lack of standing. The court stated he sought to challenge the CHRB's "decision concerning a complaint . . . by [CTT] alleging violations of the 2019 [RMAs]," but such complaint "may only be filed by one of the contracting entities – that is, the horsemen's organization (here, CTT) or the racing association (here, LATC and PRA)." The court summarized the LATC/PRA administrative proceedings, noting the hearing officer concluded the matter was moot, and further stated:

> "[Hollendorfer] was not a party to this administrative proceeding. Indeed, in accordance with [CHRB's] rules, he could not have properly brought a complaint alleging a violation of any RMA. ([Rule 2043].) . . . Given that [he] did not have standing to bring such a complaint before [the CHRB], it is difficult to imagine how he could have standing to bring a petition seeking judicial review thereof."

The trial court then explained a "writ petition is to be brought by the 'beneficially interested' party," citing Code of Civil Procedure section 1086. The court determined: "CTT is one of the contracting parties to the RMAs and would have a beneficial interest in any judicial determination

37

regarding the RMAs. . . . [Hollendorfer] fails to sufficiently demonstrate how he is a beneficially interested party here."

The trial court rejected Hollendorfer's claim that the CHRB's "position would eliminate any trainer from seeking judicial review," stating he cited no case where a trainer had standing to challenge a CHRB decision under Rule 2043. The court also rejected his reliance on public policy, stating he cited "no particular public policy at risk of being undermined."

## 2. Additional Law Regarding Administrative Mandate

A petition for writ of administrative mandate "allows for judicial review of quasi-judicial decisions that are made 'as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer.' ([Code Civ. Proc.,] § 1094.5, subd. (a).)" (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 85 (*Boermeester*).)

A "writ must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law," and "upon the verified petition of the party beneficially interested." (Code Civ. Proc., § 1086; *Carsten v. Psychology Examining Com.* (*Carsten*) (1980) 27 Cal.3d 793, 796 [administrative mandate requires beneficial interest]; *San Luis Rey Racing, Inc. v. California Horse Racing Bd.* (2017) 15 Cal.App.5th 67, 73 (*San Luis*) [same, traditional mandate].)

"Judicial review is limited to 'whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.' ([Code Civ. Proc.,] § 1094.5, subd. (b).)" (*Boermeester, supra*, 15 Cal.5th at p. 85.)

Although the standard of review in administrative mandate cases depends on the nature of the rights involved (*Bixby, supra*, 4 Cal.3d at

38

pp. 143-144), the central questions here—standing and mootness—are issues of law that we presumptively review de novo. (*San Luis, supra*, 15 Cal.App.5th at p. 73 [standing is a "question[ ] of law to which we typically apply a de novo standard of review"]; *Robinson v. U-Haul Co. of California* (2016) 4 Cal.App.5th 304, 319 ["Issues of justiciability, such as mootness, are generally reviewed de novo."].)

### 3. Hollendorfer Forfeits This Claim

In addressing his administrative mandate claim, Hollendorfer disregards critical principles of appellate review: he must demonstrate prejudicial error (*Hotels Nevada, supra*, 203 Cal.App.4th at p. 348), under proper headings (*Pizarro, supra*, 10 Cal.App.5th at p. 179), with adequate legal and record support (*Badie, supra*, 67 Cal.App.4th at pp. 784-785; *WFG National, supra*, 51 Cal.App.5th at p. 894), and cannot wait until the reply brief to do so (*Raceway, supra*, 2 Cal.5th at p. 178).

When he sought a writ of administrative mandate, CTT had withdrawn its complaint as to DMTC, and the CHRB had decided the LATC/PRA matter was moot. Although the trial court's ruling focused on standing, that did not relieve Hollendorfer of his burden to show in his opening brief here that the administrative proceedings were not in fact moot—and, thus, that the standing ruling harmed him (and that there was effective relief this court could provide). (See *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1251 (*Marshall*) ["a writ will not issue to enforce a technical, abstract or moot right"].)

Hollendorfer did not meet this obligation. He does not address mootness as to DMTC until his reply brief, and argues only that the trial court "did not discuss . . . any settlement" and it "is therefore not applicable in determining this appeal and has not been waived." CTT did not just settle

with DMTC; it withdrew its complaint.  If he wanted to address that proceeding, he had to do so here.  (See *In re Marriage of Weiss* (1996) 42 Cal.App.4th 106, 119 [law does not allow review of a " 'decision . . . from which an appeal might previously have been taken' "].)  Further, he does not explain, even on reply, why the DMTC proceeding is not moot.

As for LATC/PRA, Hollendorfer's opening brief merely mentioned the CHRB's mootness ruling while discussing standing, summarily claiming it was "inexplicable because, for other reasons, [the CHRB] had extended the purported lapsed RMA, retroactively . . . ."  He supplied no heading, substantive legal argument or authority, or record cites (and, as we discuss *post*, his belated reply argument used inadequate record cites and still omitted legal authority).

Accordingly, we will affirm the judgment as to the administrative mandate claim.  We do not address DMTC further.  In the interests of justice, and because the trial court relied in part on its mandate rulings to address the Government Code section 815.6 claim, we shall address why his standing argument and belated mootness argument as to LATC/PRA lack merit.

### 4.  Hollendorfer Does Not Establish Error as to Standing

Hollendorfer argues he was the beneficially interested party, not CTT, including as a third party beneficiary of the RMA, and the trial court erred in ruling he lacked standing.  We reject these contentions.

### a.  Additional Law Regarding Standing

"At its core, standing concerns a specific party's interest in the outcome of a lawsuit."  (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247 (*Weatherford*).)  Code of Civil Procedure section 1086 provides, inter alia, that a writ of mandate issues to "the party beneficially interested."

" 'The requirement that a petitioner be "beneficially interested" has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.' " (*Personnel Com. v. Barstow Unified School Dist.* (1996) 43 Cal.App.4th 871, 877 (*Barstow*).)  This standard " 'is equivalent to the federal "injury in fact" test, which requires a party to prove . . . it has suffered "an invasion of a legally protected interest that is [both] '(a) concrete and particularized, and (b) actual or imminent . . . .' " ' " (*People ex rel. Dept. of Conservation v. El Dorado County* (2005) 36 Cal.4th 971, 986; *Marshall, supra*, 119 Cal.App.4th at p. 1251 [petitioner " 'must show his legal rights are injuriously affected by the action being challenged' "].)

Code of Civil Procedure section 367 "imposes a similar requirement for civil actions generally":  " 'Every action must be prosecuted in the name of the real party in interest, except as otherwise provided by statute.' " (*Barstow, supra*, 43 Cal.App.4th at p. 877.)  " 'Generally, "the person possessing the right sued upon by reason of the substantive law is the real party in interest." ' " (*Gantman v. United Pacific Ins. Co.* (1991) 232 Cal App.3d 1560, 1566.)

Policy considerations also may be pertinent to standing.  (*Weatherford, supra*, 2 Cal.5th at p. 1248 [California's "standing jurisprudence . . . reflects a sensitivity to broader prudential and separation of powers considerations elucidating how and when parties should be entitled to seek relief under particular statutes."].)

### b. Beneficially Interested Party

Hollendorfer argues he was the party whose legal rights were affected by the administrative proceedings; CTT's interests were not implicated by his

41

grievances; and the trial court erroneously discounted these facts "because [he] was not the named party in the underlying complaint and contract." These contentions lack merit.

First, Hollendorfer argues that "[a]t all times," he was the beneficially interested party and real party in interest. He explains he has a constitutional right to use his license to practice his profession, echoing his traditional mandate arguments, and the administrative proceedings solely concerned "his ability to participate" in race meets. As explained above, his license did not necessarily entitle him to participate in specific race meets. (See *Tisher, supra*, 231 Cal.App.3d at p. 355 [plaintiffs had "no absolute right to participate in . . . race meetings by virtue" of their licenses].) And he does not establish his participation is what the proceedings were about, regardless.

Rather, the legal interests at issue were under the RMAs between CTT and LATC/PRA. CTT's complaint stated: "The unilateral decision of [Stronach] to eliminate [Hollendorfer's] participation in racing and training at [Stronach] tracks under [Stronach's] 'safety and accountability' procedures is violative of Section 5" of the RMAs. It continued: "CTT has not agreed to or consented to [Stronach's] decision to eliminate Hollendorfer's participation . . . . Accordingly, we ask the CHRB to immediately intervene and order [Stronach] to stay its ongoing exclusion . . . pending . . . a decision from a CHRB hearing of this matter." The complaint did not identify Hollendorfer as the real party in interest. Nor did it "include[ ] a single remedy" of CHRB intervention to stay the exclusion, as he initially claims. Rather, as he then acknowledges, it sought the stay " 'pending . . . a decision from a CHRB hearing' "—which would be on the *contractual* issue.

42

Thus, the substantive legal issue was not Stronach's or LATC/PRA's ability to deny participation to Hollendorfer (much less his right to enter race meets generally). The 2018-2019 RMAs permitted them to do so, subject to certain conditions. The issue was whether they violated those conditions by denying participation without CTT's consent.

Second, and in turn, Hollendorfer fails to establish CTT's interests were not at issue. Whether Stronach and LATC/PRA complied with the RMAs was directly relevant to CTT, as the designated representative for *all* trainers who applied to participate under them. (§ 19613 [CTT represents trainers].) This representation is consistent with CTT's role as a horsemen's organization in facilitating orderly race meets. (Rules 2040 [the CHRB "recognizes the need for . . . trainers to negotiate . . . with racing associations"; to "fulfill its duties to the public in authorizing the conduct of an uninterrupted, orderly race meeting," the CHRB "shall acknowledge one . . . horsemen's organization that represents . . . trainers"], 2041 [requiring trainer compliance with RMA].) Nor does Hollendorfer show CTT was unauthorized to address grievances, as he suggests. (§ 19613.1, subd. (a) [the CHRB decides on additional matters for negotiation].)

The RMAs confirm CTT's role in this regard. The recitals state the parties reached the agreement to "stabilize certain phases of the business" to "avoid[ ] controversies between them" that might interfere with race meets "to the detriment of [the] [Racing Associations], CTT, [and trainers]," and to "provid[e] for an orderly and uniform method of dealing with issues involving the racetrack, track safety, the backstretch, and the welfare of trainers and other backstretch personnel . . . ." Section 5 effectuates these aims by providing guidelines for limits on race meet participation, and CTT had an interest in enforcing it.

43

Third, Hollendorfer argues "contractual standing between the parties of a contract" should not be confused with the "standing of a beneficially interested party," and the trial court erred by focusing on the former. Contractual party status can be pertinent to standing, as Hollendorfer impliedly concedes in arguing he was a third party beneficiary (see *post*). (See *Jones v. Aetna Casualty & Surety Co.* (1994) 26 Cal.App.4th 1717, 1722 ["someone who is not a party to the contract has no standing to enforce it"].) Here, it suffices to reiterate that the administrative proceeding was a contractual dispute, so the issues are related.

Fourth, CTT's decision not to pursue mandate relief does not change our analysis (whether it was for financial reasons or otherwise, see *post*). One purpose of standing requirements is to promote finality, by minimizing challenges to proceedings that participants accepted. (Cf. *Cloud v. Northrop Grumman Corp.* (1998) 67 Cal.App.4th 995, 1008, fn. 5 [purpose of "real party in interest requirement is to ensure that a resulting judgment will impose a res judicata effect"]; cf. *Municipal Court v. Superior Court* (1993) 5 Cal.4th 1126, 1131 [municipal court lacked standing to challenge superior court decision; the " 'premise under which the judiciary operates is straightforward: if no individual party finds it worth his or her while to champion the cause and seek judicial review, then review will not occur.' "].)[14]

---

[14] The CHRB asserts Hollendorfer could have intervened in the administrative proceeding. He disagrees, stating Rule 2043 "limits participation to the 'contracting entities,' " and also argues he "de facto" appeared by prompting CTT to file a complaint. Rule 2043 addresses who "may . . . file[ ]" a complaint, not participation, and de facto intervention requires "actually participat[ing]" in the litigation. (*Vosburg v. County of Fresno* (2020) 54 Cal.App.5th 439, 461.) Because there is no indication Hollendorfer tried to intervene in the CHRB proceedings, we need not resolve whether he could have, or any ensuing impact on standing.

44

Hollendorfer also argues more broadly that the CHRB's regulatory scheme cannot limit his right to judicial review, noting the CHRB requires the RMAs. He further suggests a licensee should have standing to challenge an agency proceeding if his job is impacted, as a matter of due process. We are not persuaded. The CHRB is the entity vested with regulatory authority, the RMAs are one method by which it carries out its obligations, and "[i]n the absence of compelling circumstances, [it] should be permitted to carry out its functions without undue judicial interference." (*Sangster v. California Horse Racing Bd.* (1988) 202 Cal.App.3d 1033, 1039-1040 (*Sangster*).) As for the notion that licensees presumptively have standing for judicial review, he cites no standing case law to support it, and it would raise serious policy implications for any regulated profession. (See *Weatherford, supra*, 2 Cal.5th at p. 1248 [policy is pertinent to standing]; cf. *Carsten, supra*, 27 Cal.3d at p. 801 ["the California judiciary is ill-equipped to add to its already heavy burden the duty of serving as an ombudsman for the plethora of state administrative agencies and local agencies"].)

Finally, the standing cases cited by Hollendorfer involve actual license suspension, which this case does not, or are otherwise distinguishable. (See *Medical Board v. Superior Court* (2001) 88 Cal.App.4th 1001, 1004-1105 [doctor had standing to challenge license suspension in effect when he filed his petition]; *Rudisill v. California Coastal Com.* (2019) 35 Cal.App.5th 1062, 1072 & fn. 4 [reversing anti-SLAPP sanctions against moving parties with direct interest in property at issue in mandamus proceeding; one could reasonably conclude a "real party in interest in a mandamus proceeding" is "a 'person' against whom a claim is asserted" for anti-SLAPP purposes]; *Sonoma County Nuclear Free Zone '86 v. Superior Court* (1987) 189 Cal.App.3d 167, 170, 173-175 [ballot proposition dispute; "pro" group had standing to seek

writ relief compelling superior court to set aside order requiring clerk to accept late ballot arguments from "con" group; stating in part that "[w]hen a county initiative is qualified," and "cognizable groups are . . . in direct conflict," each has a "clear interest" in addressing the other's arguments].)

### c. Third Party Beneficiary

Hollendorfer argues he also has standing as a third party beneficiary of the RMA. The trial court rejected this argument, and he does not establish reversible error.

In *Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817 (*Goonewardene*), the California Supreme Court set forth a three-part test to assess if a non-party is a third party beneficiary of a contract. (*Id.* at p. 821.) The elements are: "(1) whether the third party would in fact benefit from the contract, . . . (2) whether a motivating purpose of the contracting parties was to provide a benefit to the third party, and (3) whether permitting a third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties." (*Id.* at p. 830.) "All three elements must be satisfied to permit the third party action to go forward." (*Ibid.*)

Section 24(h) of the RMAs is titled "<u>No Third Party Beneficiaries</u>," and states that, except as to indemnification, "[T]he provisions of this [RMA] are not intended to be for the benefit of, or enforceable by, any party other than Track or CTT. Except for Track and CTT, no party shall have any right to rely upon or enforce any of the terms and provisions of this [RMA] . . . ." The trial court ruled Hollendorfer was not a third party beneficiary, but rather an incidental beneficiary of the RMA. It noted he did "not point[ ] to any provision . . . that recognize[d] him as an intended third-party beneficiary," and his reliance on the RMA's "stated general purpose" was insufficient.

46

On appeal, Hollendorfer does not address the third *Goonewardene* element, and cannot establish reversible error. (*Goonewardene, supra*, 6 Cal.5th at p. 830 ["[a]ll three elements must be satisfied . . . ."].) He does not persuade us the court erred, regardless.

The RMA expressly states there are no third party beneficiaries. Hollendorfer identifies no RMA language showing that benefitting individual trainers remained a motivating purpose of the parties. (*Goonewardene, supra*, 6 Cal.5th at p. 830; compare *Prouty v. Gores Technology Group* (2004) 121 Cal.App.4th 1225 [where company sale contract stated buyer would retain seller's employees or pay severance benefits, employees were third party beneficiaries, despite contract saying it was not intended to benefit third parties] with *LaBarbera v. Security National Ins. Co.* (2022) 86 Cal.App.5th 1329, 1345 ["indemnitee defense clause" did "not directly benefit" homeowner, unlike in *Prouty*; the " 'intent . . . was to benefit [defendant] and [contractor], with [homeowner] as an incidental beneficiary"].)

Rather, Hollendorfer argues that "[b]y virtue of controlling statutes and regulation, the agreements were not for the specific benefit of CTT, but rather for the collective benefit of individual horse trainers it represent[s]," citing Sections 19401, subdivisions (a) and (e), Sections 19613 to 19613.3, and Rule 2040. He also asserts, inter alia, that Rule 2044 requires RMAs be posted at tracks, supposedly showing the CHRB views trainers as beneficiaries, and the RMAs have provisions that benefit him as a trainer. These points lack merit. Section 19613.3 was repealed; the remaining cited sections and rules that address RMAs reflect they have broad purposes (and none mention benefits to individuals); and beyond that, we already rejected his argument that the RMAs were for the benefit of trainers as individuals.

47

The fact that he may view certain specific parts as helpful to him does not establish a different purpose. (Cf. *Martinez v. Socoma Cos.* (1974) 11 Cal.3d 394, 401 [residents who received job training under government contracts, but not jobs, were not third party beneficiaries; although they were "among those . . . intended to benefit" from contracts, the "benefits of such programs are provided . . . as a means of accomplishing a larger public purpose"].)

Additionally, if we did reach the third element, we would conclude Hollendorfer could not show that letting him pursue disputes under the RMA (including ones CTT elected *not* to pursue) is "consistent with the objectives of the contract and the reasonable expectations of the contracting parties." (*Goonewardene, supra*, 6 Cal.5th at p. 830.) To the contrary, allowing actions by individual trainers could *undermine* the benefits of a single, negotiated agreement—impeding the role of RMAs in the regulatory scheme, and frustrating the expectations of the contracting parties.

### 5. Hollendorfer Does Not Establish Error as to Mootness

Hollendorfer argues the LATC/PRA administrative proceeding was not moot because the CHRB extended the RMAs.[15] We are not persuaded.

"A case becomes moot when a court ruling can have no practical impact or cannot provide the parties with effective relief." (*Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1503.) The "pivotal question in determining if a case is moot is therefore whether the court can grant the plaintiff any

---

[15] He does not address the CHRB's finding that the matter was not of broad interest or likely to recur, and forfeits any challenge to it. (*Badie, supra*, 67 Cal.App.4th at pp. 784-785.) We also do not reach his claim that there was an "unreasonable delay" between the complaint and the "conveniently timed" hearing decision. If he is making a legal point, he has supplied no analysis or authority, and it is forfeited too.

effectual relief." (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1574.)

Courts have held that actions based on contracts are rendered moot by their expiration or completion. (See *Daily Journal Corp. v. County of Los Angeles* (2009) 172 Cal.App.4th 1550, 1557 (*Daily Journal*) [case moot where contract had expired, and court could not award it to disappointed bidder]; *Giles v. Horn* (2002) 100 Cal.App.4th 206, 212, 227-228 [challenge to county contracts was moot where contracts had been performed and expired].)

Here, the CHRB hearing officer found the LATC/PRA matter was moot, because the RMAs applied only to the period ending December 25, 2019, had expired, and were no longer enforceable. Section 1 of the RMAs states: "Race Meet. Except as otherwise provided herein, the provisions of this [RMA] shall be applicable only to the thoroughbred race meetings conducted by Track under license from the CHRB for the period commencing December 26, 2018 through December 25, 2019 (the 'Term')." Section 24(a) is titled "Modifications," and states in pertinent part:

> "This [RMA] constitutes the entire agreement between the Parties hereto and supersedes any and all other agreements, understandings, negotiations, or discussions, either oral or in writing, express, or implied, between the Parties hereto . . . . It is expressly understood and agreed that this Agreement may not be altered, amended, modified, or otherwise changed in any respect or particular whatsoever except by a writing duly executed by an authorized representative of each Party."

The RMAs list CTT and the respective Racing Associations as the parties.

The hearing officer could impliedly and properly consider these provisions together to find the RMAs had expired. (See *Coral Farms, L.P. v. Mahony* (2021) 63 Cal.App.5th 719, 727 ["A contract is read as a whole, 'so as to give effect to every part, if reasonably practicable, each clause helping to

49

interpret the other.' "].)  Section 1 limits RMA applicability to the designated term, absent modification under Section 24(a)—which can only occur in a "writing duly executed by an authorized representative" of a party.  The CHRB argues, and Hollendorfer does not dispute, that "[n]either side presented a written agreement modifying the RMA to extend its effective dates."  The hearing officer could then conclude CTT's complaint regarding the RMAs was moot (*Daily Journal, supra*, 172 Cal.App.4th at p. 1557), and the CHRB could properly adopt his finding.

Hollendorfer does not establish otherwise.  After summarily claiming in his opening brief standing arguments that the RMAs were extended, he argues on reply that the CHRB "had continually extended the very same 2018/2019 RMAs as a condition of licensure for all subsequent race meets up to and including through the summer of 2022."  He further argues the RMAs were "therefore . . . operative for all other CHRB purposes."  He cites no RMA language or legal authority for these arguments, and the points he does offer lack merit.

First, he states the continuation of the RMAs during the relevant timeframe is "clearly reflected in the CHRB's Meeting transcripts," citing without elaboration twelve ranges of record cites covering over 300 pages (from nearly 2000 pages of meeting transcripts).  He also states, without record or legal citations, that this "extension of the RMAs was an official act" of the CHRB, and it should be estopped from selective enforcement.

This is not adequate for appellate review.  (Cf. *Stop Syar Expansion v. County of Napa* (2021) 63 Cal.App.5th 444, 459 ["list of string cites to the administrative record without explanation" was insufficient]; *Billauer v. Escobar-Eck* (2023) 88 Cal.App.5th 953, 969 [rejecting appellant's claim that "the search warrant speaks for itself" in support of a factual assertion, which

50

essentially asked the court to "ascertain the relevant portions" and use them to verify the assertion; "It is not our function to scour the record and make [appellant's] arguments for him."].)

Second, Hollendorfer asserts the CHRB "does not dispute the RMAs were continually extended . . . ." (Underscore omitted.) The CHRB stated in its respondent's brief that "the RMA's terms did not extend past its stated expiration date" and it was "not modified to extend its scope." (Boldface & capitalization omitted.) By waiting until his reply brief to identify the CHRB meetings as the basis for his extension argument, he deprived the CHRB of a meaningful opportunity to respond. (*Groundwater Cases, supra*, 154 Cal.App.4th at p. 693.) We note the CHRB did object to his reliance on these transcripts in the trial court.

Even assuming the CHRB permitted or required LATC/PRA to continue operating under the 2018-2019 RMAs, Hollendorfer does not establish they remained enforceable agreements for purposes of providing the relief sought in CTT's administrative complaint—the key issue for mootness. (Cf. *County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1557, 1628-1629 [rejecting argument that claim regarding expired waste handling contract was "not moot unless that contract [could not] be renewed or extended"; "mere prospect" that contract "or a similar contract might become operative . . . does not create an actual, present controversy"]; *Vallejo Police Officers Assn. v. City of Vallejo* (2017) 15 Cal.App.5th 601, 612-613 ["Like other contracts, MOU's ordinarily cover distinct periods of time"; party "asserting that contract rights . . . survive the contract term" must overcome contrary presumption].)[16]

---

[16] We have a final observation here. A writ issues when there is a beneficial interest *and* no "plain, speedy, and adequate remedy, in the

**D.** *Request for Witness Testimony*

Hollendorfer asserts the trial court erred by denying his request for live witness testimony. He does not establish any prejudicial abuse of discretion.

### 1. Additional Facts

Prior to the hearing on his petition, Hollendorfer filed a Request To Introduce Oral Testimony by CTT executive director Alan Balch. He argued the testimony was necessary to refute the CHRB's argument that CTT would have standing, not him. He stated Balch would testify that CTT was required under the RMAs to "bring [his] grievance to the racing association and then the CHRB on [his] behalf." He further stated Balch also would testify CTT is "organized as a mutual benefit corporation, and . . . lacks the financial resources to pursue litigation on behalf of its members." The CHRB filed objections, which do not appear to be in the record.

On October 7, the trial court issued its tentative ruling denying Hollendorfer's petitions. The court noted it received the CHRB's "objections to [the] request to introduce oral testimony," though it "did not receive" the request, and ruled, "In any event, the court will not permit oral testimony at the hearing." In its order denying the petitions, the court stated it "denied [the] request to introduce oral testimony at hearing." It appeared to be confirming its prior ruling, as it did not address the request at the hearing.

### 2. Additional Law

Under California Rules of Court, rule 3.1306(a), evidence at a "law and motion hearing must be by declaration or request for judicial notice without

---

ordinary course of law." (Code Civ. Proc. § 1086; *Polanski v. Superior Court* (2009) 180 Cal.App.4th 507, 552-553.) Hollendorfer does not explain why the now-settled superior court actions that he and/or CTT filed against the Racing Associations were inadequate. Indeed, the CHRB hearing officer said a breach of contract action was CTT's remedy to challenge the RMA.

testimony or cross-examination, unless the court orders otherwise for good cause shown." (See Cal. Rules of Court, rule 3.1103(a)(2) [" '[l]aw and motion' " includes writ of mandate proceedings].) Thus, a trial court "has the discretion to decide a writ petition on declarations and other documents as opposed to oral testimony." (*DiRaffael v. California Army National Guard* (2019) 35 Cal.App.5th 692, 717-718 (*DiRaffael*), accord, *American Federation of State, County & Municipal Employees v. Metropolitan Water Dist.* (2005) 126 Cal.App.4th 247, 263 [trial court has " 'broad discretion' " to decide writ of mandate proceeding on documents].)

" 'A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446-447; *DiRaffael, supra*, 35 Cal.App.5th at p. 718 [appellant had to show a " ' "reasonable probability that in the absence of the [purported] error, a result more favorable to the appealing party would have been reached." ' "].)

### 3. Analysis

Hollendorfer does not address in his briefing here what he wanted Balch to testify about, much less prejudice from its absence, and thus cannot establish reversible error. We see no grounds for reversal regardless.

Hollendorfer's sole argument is that the trial court "indicated that it did not review [his] application and denied it," meaning it "failed to consider" his reasons. Although it is unclear why the court did not receive his request, it did receive the CHRB's objections, and given it issued a ruling, we infer it viewed the objections as a sufficient basis to consider and rule on the request. (Evid. Code, § 664 ["It is presumed that official duty has been regularly

53

performed."]; *Hotels Nevada, supra*, 203 Cal.App.4th at p. 348 [order is presumed correct].) He establishes no abuse of discretion.

Nor do we see how Hollendorfer could have achieved a better result with the proposed testimony from Balch. (*DiRaffael, supra*, 35 Cal.App.5th at p. 718.) The testimony about RMA grievance procedures was unnecessary, as this contractual language was neither ambiguous, nor in dispute. As for the testimony about CTT's limited financial resources to pursue litigation, he cites no legal authority that this is relevant to standing (nor does he address the fact that CTT agreed in the RMA to handle grievances and preclude third party beneficiaries). His general concern on reply that the CHRB imposes this duty on CTT without respect to financial ability also lacks force. It is for the CHRB, not this court, to balance the burdens of the regulatory scheme. (Cf. *Sangster, supra*, 202 Cal.App.3d at pp. 1039-1040.)

## E. *Government Code Section 815.6*

Finally, Hollendorfer does not show the trial court erred by granting judgment on the pleadings on his Government Code section 815.6 claim.

### 1. Additional Facts

Hollendorfer's cause of action for a violation of Government Code section 815.6 relied on similar allegations as his writ of mandate claims. He alleged, in substance, that the CHRB failed to discharge mandatory duties by improperly denying him a hearing, and by letting the Racing Associations deny his race meet entries under RMAs in violation of CHRB rules and his constitutional rights as a licensee.

In January 2023, the CHRB filed an opposed motion for judgment on the pleadings on the Government Code section 815.6 claim, arguing in part that the claim was mooted by the trial court's denial of the writ petition.

54

In June 2023, the trial court granted the motion without leave to amend. The court agreed the claim was moot to the extent it rested on the same theories as Hollendorfer's mandate claims, for the same reasons (i.e., no duty to have a hearing, and no standing). The court further determined that, to the extent Hollendorfer's Government Code claim was not moot, he failed to "adequately allege the existence of any statutory mandatory duty owed by [the CHRB] sufficient to serve as a basis for liability pursuant to Government Code section 815.6."

### 2. Additional Legal Principles

"Under the Government Claims Act . . . governmental tort liability must be based on statute." (*B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 179 (*B.H.*).) Government Code section 815.6 "provides a statutory exception to the general rule of public entity immunity . . . ." (*B.H.*, at p. 179.) It states: " 'Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.' "

Thus, Government Code section 815.6 has "three elements that must be satisfied to impose public entity liability: (1) a mandatory duty was imposed on the public entity by an enactment; (2) the enactment was designed to protect against the particular kind of injury allegedly suffered; and (3) the breach of the mandatory statutory duty proximately caused the injury." (*B.H., supra*, 62 Cal.4th at p. 179.)

" 'A motion for judgment on the pleadings, like a general demurrer, tests the allegations of the [operative pleading], supplemented by any matter

of which the trial court takes judicial notice, to determine whether [the party] has stated a cause of action.' " (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166.) "In an appeal from a motion granting judgment on the pleadings, we accept as true the facts alleged in the complaint and review the legal issues de novo." (*Ibid.*) "We review the disposition, not the court's reasons for that disposition." (*Ellerbee v. County of Los Angeles* (2010) 187 Cal.App.4th 1206, 1214 (*Ellerbee*).)[17]

### 3.  Analysis

Hollendorfer argues the trial court erred in granting judgment on the pleadings, because he had standing for his administrative mandate claim (so that aspect of his Government Code claim was not moot) and the CHRB owed him a mandatory duty under section 19573.

These are essentially the same arguments Hollendorfer made for his mandate claims, and we have rejected them.  He identifies no reason to warrant a different resolution in the context of Government Code section 815.6.  For standing, he incorporates his arguments "by reference . . . ."  For section 19573, he argues in pertinent part that the CHRB is "obligated by law to follow applicable statutes and regulations," its motion was "premised upon its interpretation of [section] 19573," and we should conclude that "pursuant to [section] 19573 and its regulations," the CHRB "owed [him] a mandatory duty."  But, as discussed above, the CHRB had no duty to provide him with a hearing after the Racing Associations denied participation pursuant to the RMAs.  Thus, he does not show either issue supports reversal here

_____

17     Although "review of a judgment on the pleadings ordinarily includes a second step . . . whether the trial court abused its discretion in denying leave to amend," we "need not reach that issue" because, inter alia, Hollendorfer "has not asked this court to grant leave to amend." (*Tak Chun Gaming Promotion Co. Limited v. Long* (2023) 96 Cal.App.5th 1027, 1032, fn. 3.)

(regardless of whether the trial court properly determined the issues were moot in light of its writ denial).  (*Ellerbee, supra*, 187 Cal.App.4th at p. 1213.)

Further, Hollendorfer does not establish he could satisfy the other two elements of a Government Code section 815.6 claim.  He does not address how the statutes and regulations cited in his petition were "designed to protect against the particular kind of injury" at issue.  (See *B.H., supra*, 62 Cal.4th at p. 179.)  Although he does summarily assert that the CHRB's "failure to immediately 'hold the hearing' caused [him] significant damages," he does not explain how this supports proximate cause for purposes of section 815.6.  And, as noted, he has not asked for leave to amend, nor does he explain how he could meet his burden to do so.

## IV.  DISPOSITION

The judgment is affirmed.  The California Horse Racing Board is entitled to its costs on appeal.

KELETY, J.


WE CONCUR:

HUFFMAN, Acting P. J.

CASTILLO, J.

57